# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Alcatraz Media, Inc.,               :

                            :

         Plaintiff,           :

                            :

        v.                :       CIVIL ACTION NO.

                            :       1:10-cv-00380-JOF

Medieval Times Georgia, Inc., et al.,   :

                            :

        Defendants.       :

## OPINION & ORDER

Defendants' Motion for Summary Judgment [53], Defendants' Motion for Summary Judgment [54], Defendants' Motion for Summary Judgment [57], Plaintiff's Motion to Strike [101], Plaintiff's Motion to Strike [103], Plaintiff's Motion to Strike [104], Defendants' Motion for Oral Arguments [109], and Plaintiff's Motion for Leave to File [122].

## I.    Factual and Procedural History

Plaintiff Alcatraz Media, Inc. ("Alcatraz") is a registered ticket broker whose business is to book services for tours and travel-related activities through websites that it runs. Defendants are all various related entities that are involved in the entertainment business, and they will hereinafter be referred to as "Medieval Times." Medieval Times operates nine medieval-themed "castles" in eight states and Canada. At the castles,

tournament events are hosted, which include a meal served without silverware and a medieval-themed performance featuring Andalusian horses and also actors in period dress. Alcatraz and Medieval Times have been doing business together for a number of years. Alcatraz issued vouchers for Medieval Times shows to its customers. The customers then redeemed those vouchers at one of the Medieval Times castles. Then Alcatraz paid Medieval Times, at the rates set by the parties, for those vouchers that were presented by customers at one of the castles. This lawsuit stems from that business relationship.

On April 23, 2008, Plaintiff filed a complaint in the Superior Court for Gwinnett County, Georgia against various Medieval Times entities[1] asserting claims for breach of contract and attorney's fees and costs. On June 18, 2008, those Defendants entered a joint special appearance and filed an answer and alternative counterclaim. In their original answer and counterclaim, Defendants denied liability for those claims asserted in Plaintiff's original complaint, and while objecting to jurisdiction and venue, raised counterclaims against Alcatraz including a federal cause of action for trademark infringement under the Lanham Act. Defendants later consented to laying venue in Gwinnett County. In September 2009,

---

[1] Specifically, Medieval Times Georgia, Inc.; Medieval Times Maryland, Inc.; Medieval Times California, Inc.; Medieval Knights, LLC; Medieval Times Myrtle Beach, Inc.; Meadowlands Castle, Inc. (misidentified in the Original Complaint as Medieval Nights, LLC); and Medieval Times Management, Inc.

2

several Defendants[2] merged into Medieval Times USA, Inc, and following a court order, Medieval Times USA was substituted as the real party in interest for those entities. Meanwhile, in March of 2009, Medieval Times USA, Medieval Times Georgia, Medieval Times Maryland, and Medieval Times Dinner and Tournament Toronto filed a lawsuit against Alcatraz in the United States District Court for the Central District of California. That complaint asserted claims for trademark infringement, false advertising, unfair competition under California law, intentional interference with prospective business relations, and negligent interference with prospective business advantage.

After Medieval Times USA was substituted as a party in the Georgia Lawsuit, the various Medieval Times entities and Alcatraz agreed to consolidate the Georgia and California Lawsuits into a single suit in Gwinnett County Superior Court. On February 9, 2010, Medieval Times Dinner and Tournament Toronto was added as a party to this case, and Plaintiff and Defendants were granted leave to amend their pleadings so that they might incorporate the claims from the California Lawsuit. The California Lawsuit was then dismissed without prejudice. Plaintiff and Defendants' proposed amended pleadings, the Amended Complaint and the Amended and Restated Counterclaim, were deemed filed as of the entry of the Superior Court's order granting leave to amend on February 9, 2010. On

---

[2] Medieval Times Myrtle Beach, Inc.; Meadowlands Castle, Inc.; and Medieval Times Management, Inc.

3

February 10, 2010, Defendants removed this case to the United States District Court for the Northern District of Georgia based on Plaintiff's Amended Complaint.

Plaintiff's Amended Complaint, which is now the operative complaint in this action, asserts several claims for breach of contract, as well as claims for indemnity, breach of the implied covenant of good faith and fair dealing, damages for dishonoring vouchers, fraud, and interference with prospective economic advantage. Plaintiff further seeks damages arising out of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372, *et seq.* and attorney fees and costs pursuant to provisions of several agreements between the parties and/or O.C.G.A. § 13-6-11. Plaintiff also requests declaratory judgment concerning its right to participate in the Defendants' "reseller market."

Defendants' Amended and Restated Counterclaim alleges causes of action for violations of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, *et seq.*, for false advertising under O.C.G.A. § 10-1-421(a), trademark infringement and false advertising pursuant to the Lanham Act, common law unfair competition and unfair and deceptive trade practices under California state law, breach of contract, intentional interference with prospective business relations, and negligent interference with prospective business relations. Defendants also seek attorney fees and costs pursuant to provisions of several agreements between the parties and/or O.C.G.A. § 13-6-11.

Defendants filed three separate motions for summary judgment. The first motion, "Motion for Summary Judgment 1," seeks summary judgment only on Count One of Plaintiff's Amended Complaint, which is for breach of contract. "Motion for Summary Judgment 2" requests summary judgment on Counts Two through Nine of Plaintiff's Amended Complaint, and therefore, by virtue of both Motions for Summary Judgment 1 and 2, Defendants seek summary judgment on all of Plaintiff's claims except the claim for declaratory judgment and the request for attorney fees and costs. Finally, Defendants' "Motion for Summary Judgment 3" seeks summary judgment on some of Defendants' counterclaims – those for false advertising, unfair and deceptive trade practices under California law, and for alleged violations Georgia's Uniform Deceptive Trade Practices Act ("GUDTPA").

Plaintiff filed three separate motions to strike some of the evidence offered by Defendants in support of their Motions for Summary Judgment, and Defendants request oral argument on their Motions for Summary Judgment. Plaintiff has also filed a motion unrelated to the pending summary judgment motions, in which Plaintiff seeks leave of the court to file an answer to Defendants' Amended and Restated Counterclaim.

## II.    Discussion

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file,

AO 72A
(Rev.8/82)

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Regarding "issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)."Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case . . ." *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The nonmoving party then "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party . . . [or] he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Fitzpatrick*, 2 F.3d at 1116-17. All reasonable doubts should be resolved in the favor of the nonmovant. *Id.* at 1115.

AO 72A
(Rev.8/82)

### A.    Initial Issues

#### 1.    Compliance with the Local Rules

Before addressing the substance of the pending summary judgment motions, the court first addresses some initial matters. Defendants filed three separate motions for summary judgment. Courts in this circuit "do not approve in general the piecemeal consideration of successive motions for summary judgment." *Allstate Fin. Corp. v. Zimmerman*, 296 F.2d 797, 799 (5th Cir. 1961).[3] The court "has discretion to require parties to present their arguments in a single motion for summary judgment . . . and the Court sees no reason why these three separate motions could not have been consolidated." *Impreglon, Inc. v. Newco Enters., Inc.*, 508 F. Supp. 2d 1222, 1225 n. 1 (N.D. Ga. 2007) (Story, J.). By filing three separate motions for summary judgment, Defendants have made it so that there are three separate briefs, three separate statements of material undisputed facts, three separate response briefs by Plaintiff, three reply briefs, etc. This court's local rules make it clear that parties may not file briefs in excess of 25 pages without permission of the court, and by filing three separate motions, Defendants have effectively, yet inappropriately, avoided this rule. Because the parties have now spent considerable time and effort arguing these three

---

[3] The Eleventh Circuit, sitting *en banc* in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

7

motions, the court will review them all. Defendants, however, should alter their behavior in the future.

The court also addresses Plaintiff's Listing of Additional Facts [93]. Pursuant to this court's Local Rule 56.1, movants for summary judgment must include with their motion a statement of material facts that the movant contends are undisputed. L.R. N.D. Ga. 56.1B(1). Defendants did so. In response, Plaintiff was required to respond to Defendants' statements of material facts, L.R. N.D. Ga. 56.1B(2)(a), which Plaintiff did. Plaintiff was also required to file its own additional statement of material facts that meet the requirements set out in Rule 56.1B(1). L.R. N.D. Ga. 56.1B(2)(b). Therefore, Plaintiff was required to file a statement of additional material fact that contained "separate, concise, numbered statements of the material facts to which [Plaintiff] contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact." L.R. N.D. Ga. 56.1B(1). Plaintiff, however, filed a document that is 283 pages long and which contains 293 allegedly undisputed facts. D.E. [93]. Most of Plaintiff's numbered statements contain multiple facts with only one citation to evidence at the end of the paragraph. Further, Plaintiff has formatted the document into two columns – one of which is blank for the most part, making it beyond difficult to read Plaintiff's statements. Plaintiff has also copied and pasted throughout the document some of Defendants' statements of material fact and its responses to Defendants' statements of material fact,

which are duplicative of the responses to Defendants' statement of material fact that Plaintiff has already filed. Local Rule 56.1 "is designed to help the court identify and organize the issues in the case." *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). A review of Plaintiff's Listing of Additional Fact brings this court to conclude that Plaintiff's filing does the opposite, and the court declines to take on the burden of culling through all 283 pages of purportedly undisputed fact and the accompanying citations. As Plaintiff's Listing of Additional Fact does not comply with this court's Local Rules, the court will not consider it. The court also notes that Plaintiff never actually cites to its Listing of Additional Fact, and instead, cites directly to evidence filed on the docket. The court will consider the citations found in Plaintiff's briefs, and Plaintiff's responses to Defendants' Statements of Material Fact.

### 2.    Motions to Strike

Plaintiff has also filed several motions to strike evidence offered by Defendants in support of their summary judgment motions. The first of such motions is found at Docket Entry [101]. When ruling on summary judgment, courts may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits submitted by the parties. See Fed. R. Civ. P. 56(c). Affidavits submitted in support of a motion for summary judgment must be based on personal knowledge. Fed. R. Civ. P. 56 (c)(4). Further, "[e]vidence inadmissible at trial cannot be used to avoid summary judgment." *Broadway v.*

*City of Montgomery, Ala.*, 530 F.2d 657, 661 (5th Cir.1976). Plaintiff objects both generally and specifically to the declaration of Kevin J. Ralphs, who is the Chief Financial Officer and Senior Vice President of Medieval Times Entertainment, Inc., the parent company of all of the subsidiary Medieval Times entities that own the castles.[4] "In general, Plaintiff objects to and moves to strike all statements of Mr. Ralphs that refer or relate to any events prior to March 8, 2008, because that is the first date when Mr. Ralphs became a participant in Medieval Times." D.E. [101]. Plaintiff then goes on to object to 8 of the 15 paragraphs in Mr. Ralphs' declaration. Plaintiff asserts that many of the paragraphs are clearly not made with personal knowledge, contain hearsay, or are improper lay or expert opinion testimony. *See id*. Defendants contend that all of Plaintiff's objections are unfounded.

The court finds it unnecessary to address Plaintiff's Motion to Strike on the merits for the following reasons. Defendants mainly rely on Ralphs' Declaration in support of their Motion for Summary Judgment 3 and their Statement of Material Fact filed with that motion. As explained below, the court declines to rule on that summary judgment motion on the merits, and as such, did not consider Ralphs' Declaration with regard to that motion. Defendants do cite Ralphs' Declaration a handful of times in their briefs in support of their Motions for Summary Judgment 1 and 2. The court has reviewed those citations, and they

---

[4] The declaration is found at D.E. [53-32], [54-26], and [57-4].

10

are either citations in support of background or immaterial facts, facts that Plaintiff admits are undisputed, or facts that are also supported by other evidence on the record. As such, even if the court were to strike Ralphs' Declaration, it would not alter the court's decision on the merits. Plaintiff's Motion to Strike is DENIED AS MOOT [101].

Plaintiff's second Motion to Strike found at Docket Entry [103] addresses the declaration of Mario Barriero.[5] Plaintiff contends that many of the paragraphs in the Declaration contain hearsay or are clearly not made on personal knowledge. Defendants contend that Plaintiff's complaints are unfounded. The court finds it unnecessary to address Plaintiff's contentions for the following reasons. Defendants do not cite Barriero's Declaration in support of their Statements of Material Fact with respect to their Motions for Summary Judgment 1 and 2. Although Defendants cite to the Declaration in their brief in support of their Motion for Summary Judgment 1, the only citations are solely for background facts, and as seen below, the court did not need to rely on Barriero's Declaration in light of its holding regarding Defendants' Motion for Summary Judgment 1. Defendants do not rely on Barriero's Declaration at all in support of their Motion for Summary Judgment 2. Although Defendants rely heavily on Barriero's Declaration in support of their Motion for Summary Judgment 3, as explained below, the court declines to rule on that summary judgment motion on the merits. The court also notes, that despite seeking to strike

_____

[5] Defendants filed the Declaration in support of two of their summary judgment motions. D.E. [53-33] and [57-5].

AO 72A
(Rev.8/82)

portions of the Barriero Declaration, Plaintiff admits that some of those facts found in

Defendants' Statement of Material Fact 3, which are allegedly supported by citations to the

Barriero Declaration, are undisputed. In conclusion, as the court does not address

Defendants' Motion for Summary Judgment 3 on the merits, which is the one motion that

relies heavily on facts supported by the Barriero Declaration, the court DENIES Plaintiff's

Motion to Strike as MOOT [103].

Plaintiff's third Motion to Strike, found at Docket Entry [104], concerns Defendants'

citations to six Supplier Agreements that were attached to Plaintiff's Amended Complaint.

At the heart of this dispute, in part, are those six Supplier Agreements, which Plaintiff

contends Defendants breached. Plaintiff attached those agreements as exhibits to their

Complaint and Amended Complaint. In their first six statements of material fact, Defendants

cite to each of those agreements. For instance, in support of their Motion for Summary

Judgment 1, Defendants state the following

Undisputed Fact No. 1:

Alcatraz and Medieval Alcatraz and Medieval Times Maryland, Inc., signed
and exchanged a four-page document entitled "Supplier Agreement" on or
about January 4, 2006, **which documents appears as Exhibit F to the
Amended Complaint.**

Evidence: Amended Complaint ¶¶ 15, 50 & **Ex. F**; Deposition of Anthony B.
Windsor, taken July 1, 2009, at 92-95 & Def. Depo. Ex. 22 at AM1861-64.

AO 72A
(Rev.8/82)

D.E. [53-2], Fact 1 (emphasis added). Plaintiff seeks to strike the "Amended Complaint (or portions thereto) provided or cited in support of Defendants' Undisputed Fact Nos. 1, 2, 3, 4, 5, and 6 . . . ." D.E. [104], 2. It is unclear to the court whether Plaintiff is referring to the citations to certain paragraphs in the Amended Complaint and/or just the Exhibits attached the Amended Complaint.

Plaintiff admits that those agreements cited to by Defendants are those that were allegedly breached by Defendants, both by filing them with the Amended Complaint and in their response briefs. *See, e.g.*, D.E. [89], 2 ("The Supplier Agreements, Exhibits A through F to the Amended Complaint, are valid and enforceable contracts."). Moreover, Defendants cite to other evidence in support of their statements of fact, and Plaintiff has not argued that the remaining evidence cited does not support the fact that is alleged. Most importantly, Plaintiff states in response to Defendants' Statements of Material Fact that those relevant facts from Defendants' Statement of Material Fact (Fact 1 - Fact 6) that reference the Amended Complaint and documents filed with the Amended Complaint are indeed undisputed.[6] *See, e.g.,* D.E. [89-1], 1-10. Plaintiff's Motion to Strike is DENIED [104].

### B.     Defendants' Motion for Summary Judgment 1

_____

[6] The court recognizes that Plaintiff contends that though Defendants' statement of fact are undisputed, they are incomplete. However, Plaintiff does not dispute that those six Supplier Agreements attached to its Amended Complaint make up, at least in part, the contracts between it and Defendants that Plaintiff is contending were breached.

AO 72A
(Rev.8/82)

Defendants' Motion for Summary Judgment 1 seeks summary judgment only on Count One of Plaintiff's Amended Complaint, which is for breach of the six aforementioned Supplier Agreements. The following facts are undisputed. On January 4, 2006, Plaintiff and Medieval Times Maryland, Inc. signed and exchanged a Supplier Agreement. D.E. [53-2], Fact 1. On January 25, 2006, Alcatraz and Medieval Dinner & Tournament, Inc. signed and exchanged a Supplier Agreement. D.E. [53-2], Fact 2. On January 31, 2006, Alcatraz and Schaumburg Castle, Inc. signed and exchanged a Supplier Agreement. D.E. [53-2], Fact 3. On February 7, 2006, Alcatraz and Medieval Times Myrtle Beach, Inc. signed and exchanged a Supplier Agreement. D.E. [53-2], Fact 4. On February 9, 2006, Alcatraz and Meadowlands Castle, Inc. signed and exchanged a four-page Supplier Agreement, although Plaintiff contends that this agreement had an additional page. D.E. [53-2], Fact 5. On August 18, 2006, Alcatraz and Medieval Times Georgia, Inc. signed and exchanged a Supplier Agreement. D.E. [53-2], Fact 6. The Supplier Agreements themselves, excluding any purported attachments and schedules, are identical in all relevant aspects, other than the fact that they were signed by different Medieval Times entities on different dates.

In Count One of the Amended Complaint, Plaintiff contends that Defendants often gave lower rates to third parties than those given to Plaintiff. As such, Plaintiff alleges that Defendants breached the following provision, which was included in each Supplier Agreement:

14

2. SERVICES AND NET RATES: Supplier [One of the Medieval Castles] agrees to provide Services to Buyer [Alcatraz] at the tax-inclusive net rates indicated on the Confidential Net Rate Schedule ("Rates"). The Rates are tax-inclusive and, and any difference between Buyer's selling price and the Supplier's Rates represents Buyer's service charge for selling the Services. Buyer will set its own rates for the services that it provides to its customers. . . . Supplier may increase the rates by submitting an Amended Confidential Net rate [sic] Schedule. . . . **Supplier agrees to provide net rates to Buyer that are as low or lower than the lowest that the Supplier provides to any third party**.

E.g., Amended Compl., Ex. F (emphasis added).

Defendants contend they are entitled to summary judgment on this count of Plaintiff's Amended Complaint because the Supplier Agreements are unenforceable for failure to contain a price term. Defendants argue that based on the above-quoted language, the parties clearly intended the rates to be found in certain "Confidential Net Rate Schedules."[7] Defendants allege that no Confidential Net Rate Schedules were ever made nor did any exist at the time the agreements were signed, and therefore, the parties never agreed on a price. As a price term is essential to a contract, and the parties did not mutually agree on a price, the Supplier Agreements are unenforceable. Even if the Supplier Agreements are enforceable, Defendants argue that the phrase "Supplier agrees to provide net rates to Buyer that are as low or lower than the lowest that the Supplier provides to any third party," is too

_____

[7] The Supplier Agreements also contain the following merger clause: "18. ENTIRE AGREEMENT: This Agreement and the accompanying Schedules constitute the entire Agreement between the parties relating to the subject matter contained herein. All waivers or amendments to this Agreement must be in writing and signed by both parties." E.g., Amended Compl., Exhibit F.

AO 72A
(Rev.8/82)

vague and indefinite to enforce. Finally, Defendants argue that even if the Supplier

Agreements are enforceable, Plaintiff cannot show damages, and therefore, cannot recover

for the breach of contract alleged in Count One of their Amended Complaint.

As Defendants' point out, it is undisputed that "Each of the six Supplier Agreement

documents, in the first sentence of paragraph 2 thereof, recites the parties' mutual intention

to agree upon the 'tax inclusive net rates indicated on the Confidential Net Rate Schedule.'"

D.E. [53-2], Fact 7. It also undisputed that "The rates to be set forth in such Confidential Net

Rate Schedules called for by the Supplier Agreement documents were to serve as the prices

Alcatraz would pay the Medieval Times castles for admissions Alcatraz sold to the public."

D.E. [53-2], Fact 8. Further, "From time to time both before and after signing the Supplier

Agreement documents, Alcatraz and the castles reached various rate agreements, voucher

program agreements, or wholesaler agreements setting forth the discounts Alcatraz would

get from Medieval Times general admission prices. [However, n]one of those separate non-

contemporaneous agreements contained any reference to the Supplier Agreement

documents." D.E. [53-2], Fact 14. No party has produced any document to the court that is

entitled "Confidential Net Rate Schedule" or a document containing rates that expressly

refers to the Supplier Agreements.

In response, Plaintiff contends that with respect to three of the Supplier Agreements,

rates were attached to or sent contemporaneously with the relevant Supplier Agreement.

16

Those Agreements pertain to the New Jersey, Maryland, and Georgia castles. Indeed, Plaintiff cites evidence showing that for the Maryland Castle, Medieval Times sent a fax to Tony Windsor of Alcatraz, the cover sheet of which states, "Here is the signed "Supplier Agreement" that we received from you . . . . I also included the 2006 rates for our venue as a reminder of our price increase (it was already signed by Ryan Windsor on 7/28/05)." D.E. [92], 219. Attached to the cover sheet is the Supplier Agreement, and a page entitled "2006 Net Wholesaler Agreement," which contains the net wholesale rates for January 1, 2006 to December 31, 2006, and also the same net wholesale rates including sales tax. *Id*. at 225. It does not, however, reference the relevant Supplier Agreement, which is not surprising as it was executed in July of 2005, whereas the Supplier Agreement was executed in January of 2006.

As for the New Jersey Castle, Plaintiff presents a document that it contends was sent to Tony Windsor of Alcatraz by Medieval Times on February 9, 2006, and it contains the Supplier Agreement, plus a fifth page with the handwritten word "Rates" at the top. *Id*. at 211-217. The document entitled "Rates" shows what the regular price was for Saturdays, including sales tax, and then discounted rates for Sundays through Fridays, including sales tax. *Id*. at 217. As for the Georgia Castle, the Supplier Agreement was signed on August 18, 2006. Amended Complaint, Exhibit A. Plaintiff then cites generally to almost 50 pages of its 350+ page "appendix" of evidence, contending that a rate sheet was sent

17

contemporaneously with the Georgia Castle Supplier Agreement.[8] In that evidence, there are several rate sheets that look similar to the one Plaintiff contends was attached to the Maryland Supplier Agreement. *See, e.g.*, D.E. [92], 230. This includes one that has Atlanta written across the top, is signed by Alcatraz, contains rates, and is effective from January 1, 2006 through December 31, 2006. *Id*. The court is unsure as to when this 2006 Net Wholesaler Agreement was executed.

As to the remaining three castles, Plaintiff contends that the parties "already had pricing schedules in force at the time that the Supplier Agreements were transmitted." D.E. [89], 3.[9] It appears from the record that the parties have been doing business together since 2004, and throughout their interactions with one another, both before and after execution of the Supplier Agreements, the parties exchanged various agreements that set out the discounted rate at which Alcatraz could obtain Medieval Times' tickets. According to

_____

[8] Plaintiff's appendix of evidence is broken up into several docket entries, but the pages are numbered 1-380. For convenience, when citing the appendix the court will simply cite to the page number placed on each page by Plaintiff.

[9] Plaintiff cites the declaration of Carolyn Bazzo, an employee of an independent contractor hired by Alcatraz to handle "some phases of business development and data entry" for Alcatraz. D.E. [92], 43. Bazzo states that she was involved in getting the Supplier Agreements executed, and in that process, "the rates sheets were not usually attached to the Settlement Agreements, except for New Jersey and Maryland where rate sheets were attached to the transmittal emails. Usually, as in the Georgia Castle, rate sheets were sent on the same day or so by a separate communication. In every case, though, rate sheets were either already in place or sent around the time the Supplier Agreements were signed." *Id*. at 45.

AO 72A
(Rev.8/82)

Plaintiff, some of those agreements were in force at the time the Supplier Agreements were signed, as discussed above. Plaintiff contends that it was clear that the parties "had an understanding regarding the price term of the Supplier Agreement," and further, "the sale of thousands of tickets by Medieval Times to Alcatraz without any pricing hitches as each transaction was processed[,] proves that there is no failure of pricing" in the Supplier Agreements. D.E. [89], 2, 4. "In daily practice, there was never any real ambiguity or misunderstanding about how the net rates were to be set or communicated. [The parties] just did it and it was not a problem." *Id*. at 14. Essentially Plaintiff alleges that despite the fact that there are no documents expressly entitled Confidential Net Rate Agreement, the parties indeed agreed on pricing, as shown by their conduct, and by those already existing rate sheets and/or those actually attached to a Supplier Agreement. As to Defendants' remaining arguments, Plaintiff contends that the language regarding the low or lowest price is not vague, and while exact calculation of damages may be difficult, it is clear that Plaintiff was damaged by Defendants' actions.

"Under OCGA § 13-3-1, the plaintiff in a breach of contract action has the burden of proving three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms." *Cline v. Lee*, 260 Ga. App. 164, 168 (2003). "[I]f there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement . . . it must follow that a valid and binding

19

contract was not made . . . ." *BellSouth Advert. & Pub. Corp. v. McCollum*, 209 Ga. App. 441, 445 (1993). "Further, as price is an essential element of a valid contract, an alleged contract on which there is no firm agreement as to the price is unenforceable." *Id.* at 444.

In the present case, the parties appear to have agreed, in part, to a price term, and the relevant language in the Agreements is not ambiguous. The Supplier Agreements state that "Supplier [One of the Medieval Castles] agrees to provide Services to Buyer [Alcatraz] at the tax-inclusive net rates indicated on the Confidential Net Rate Schedule ("Rates"). E.g., Amended Compl., Ex. F. In fact, it is undisputed that "[t]he rates to be set forth in such Confidential Net Rate Schedules called for by the Supplier Agreement documents were to serve as the prices Alcatraz would pay the Medieval Times castles for admissions Alcatraz sold to the public." D.E. [53-2], Fact 8. The problem here is that there exists absolutely no documents that purport to be "Confidential Net Rate Schedules." There were undisputedly many rate sheets exchanged by the parties, before and after the Supplier Agreements were signed, but none that are entitled Confidential Net Rate Schedule and none that refer to any Supplier Agreement. For most of the Agreements, save the New Jersey Agreement, Plaintiffs appear to be contending that the parties' previous course of dealing established that the already existing rate agreements constitute the relevant price term and/or that the parties' continued course of dealing established a price term. Although Plaintiff does not

actually address it, the doctrine of incorporation by reference is also relevant to the present inquiry.

The court begins by addressing course of dealing.[10] "There is no question that through a [subsequent] course of dealing an entirely new verbal contract may be substituted for a valid written contract, and mutual acquiescence in such course of dealing may constitute sufficient consideration for the new contract." *Reynolds v. Long*, 115 Ga. App. 182, 184 (1967). However, Plaintiff cannot be contending that later behavior by the parties created an entirely new contract, because Plaintiff's breach of contract claim is based on specific language in the Supplier Agreements. It is also true that "[a] previous course of dealings between the same parties may be shown to explain an ambiguous contract, but cannot be shown to alter or modify the clear and unambiguous stipulations of a writing complete within itself." *Weems v. Albert Pick & Co.*, 33 Ga. App. 579, 820 (1925). However, as explained previously, there is nothing ambiguous about the above provision. The parties

---

[10] Plaintiff contends that the Georgia's Uniform Commercial Code should apply to the present case because a ticket is a "good." The court disagrees. "If a contract involves only the sale of goods, the UCC applies. However, [d]ifficulty arises in determining whether the UCC applies to a hybrid contract, such as one involving both goods and services." *Ole Mexican Foods, Inc. v. Hanson Staple Co.*, 285 Ga. 288, 289 (2009) (internal citations and quotations omitted). Georgia courts apply the predominant purpose test and "look to the primary or overall purpose of the transaction." *Id.* at 290. Here, while a ticket or voucher is a tangible thing, the ticket itself merely represents what is being sold here: admission to a castle and the entertainment services Defendants provide. Therefore, the predominant purpose of the contract is to buy and sell Defendants' services, not the ticket itself, and the UCC does not apply.

21

clearly intended the price term to be governed by and found in Confidential Net Rate Schedules.

Plaintiff spends much energy focusing on the fact that there is no evidence that the parties ever had trouble determining what the relevant net rates were, and that both before and after the signing of the Supplier Agreements, Alcatraz and the castles reached various rate agreements, voucher program agreements, or wholesaler agreements setting forth the discounts Alcatraz would get from Medieval Times general admission prices. However, the issue here is whether the Supplier Agreements are enforceable. It is clear that the parties conducted much business together, but it does not automatically follow that the Supplier Agreements are the contracts that govern that relationship. Although Plaintiff contends that "The parties . . . understood the meaning of the term 'net rate schedule,'" Plaintiff cites no evidence for this proposition, and there is no evidence that any party ever referred to any documents as Confidential Net Rate Schedules. D.E. [89], 14.[11]

---

[11] Later in the same paragraph of its brief, Plaintiff does cite "generally" the entire 39 page declaration of Ryan Windsor and the entire 46 page declaration of Carolyn Bazzo. Ryan Windsor does not discuss the Supplier Agreements in his declaration. Carolyn Bazzo simply states that she was involved in getting the Supplier Agreements executed, and in that process, "the rates sheets were not usually attached to the [Supplier] Agreements, except for New Jersey and Maryland where rate sheets were attached to the transmittal emails. Usually, as in the Georgia Castle, rate sheets were sent on the same day or so by a separate communication. In every case, though, rate sheets were either already in place or sent around the time the Supplier Agreements were signed." *Id*. at 45. Further, "[t]here was never a problem with having a rate sheet attached. We had rates in place with many of the Castles before the Supplier agreements and after." *Id*. at 46. Bazzo does not expressly state that the parties intended the "Confidential Net Rate Schedule" phrase to apply to whatever rate

AO 72A
(Rev.8/82)

The court now turns to incorporation by reference. It is true that "two or more documents can together create a single contract if one of them is referenced by or incorporated into the other." *Harris v. Baker*, 287 Ga. App. 814, 816 (2007).[12] However, "[a]s a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where the provision[s] to which reference is made [have] a reasonably clear and ascertainable meaning." *Bowman v. Walnut Mountain Prop. Owners Ass'n, Inc.*, 251 Ga. App. 91, 95 (2001). For three of the Supplier Agreements, the court does not have any documents before it that Plaintiff contends are the relevant rate sheets, so there can be no incorporation by reference if there are no documents to incorporate. For the Maryland and Georgia Supplier Agreements, Plaintiff offers documents that are entitled "2006 Net Wholesaler Agreement," but in no way reference the Supplier Agreements and do not contain the phrase Confidential Net Rate Schedule. The Supplier Agreements do not contain a reasonably clear and ascertainable reference to these documents. The parties certainly could have made the reference clear by explicitly referring to the already existing

agreement was already in place, nor does Bazzo refer to the pre-Supplier Agreement rate agreements as Confidential Net Rate Schedules.

[12] It is also true that "multiple documents may be considered together as a single contract as long as all the necessary terms are contained in signed contemporaneous writings." *Harris*, 287 Ga. App. at 816. Here, however, it appears that all of the Net Wholesaler Agreements or other rate agreements that Plaintiff refers to, excluding New Jersey, were executed before the Supplier Agreements, and therefore not contemporaneous.

23

2006 Net Wholesaler Agreements or by including a reference to the Supplier Agreements in the already existing Net Wholesaler Agreements, but they did not.

However, Plaintiff has presented evidence that the New Jersey Supplier Agreement had a sheet attached to it entitled "Rates," which included tax inclusive rates. The Supplier Agreements shorten the phrase "Confidential Net Rate Schedule" to "Rates," and therefore, the court finds that the New Jersey Supplier Agreement did incorporate by reference the attached Rates sheet. However, based on the above discussion, the remainder of the Supplier Agreements fail for lack of a price term, which is an essential term for a valid contract.

Defendants' next argument is that the Supplier Agreement language that Plaintiff relies upon in support of its breach of contract claim is too vague and indefinite to be enforced. The relevant provision states that "Supplier agrees to provide net rates to Buyer that are as low or lower than the lowest that the Supplier provides to any third party." E.g., Amended Compl., Exhibit F. Defendants argue that the phrase does not "specify the comparison set for measuring the 'lowest' rate. Most obviously, the sentence does not deal with the question of time: will the 'lowest net rate' be determined on a daily, weekly, monthly, or annual basis, or once retrospectively at the end of the relationship?" D.E. [53-1], 18. Defendants then go onto list a litany of issues they think make the phrase vague and unenforceable. As evidence of the alleged problems with the provision, Defendants argue

AO 72A
(Rev.8/82)

that even after providing 33 months of reservations data to Alcatraz, Alcatraz itself is having trouble determining what its damages are.

The court finds that on its face, there is nothing ambiguous about the provision Plaintiff relies upon. It clearly states that the net rates Defendants gave to Plaintiff had to be at least as low as those net rates given to **any** third party. The language is unambiguous, although it is clearly broad. Any issues that exist regarding the language, appear to arise from actually trying to apply it in hindsight, years after the agreement was signed and Defendants had been selling tickets or vouchers to third parties and giving different rates, promotions, and discounts. That difficulty does not make the language of the Supplier Agreements itself vague or indefinite.

The court turns to the apparent difficulty in calculating the potential damages that exists in this case, if Defendants were found liable for breach of contract. Defendants have produced "data regarding reservations made at all nine Medieval Times castles during a 33-month period from January 2006 to September 2008, which records detailed the prices charged to customers (including discounted, negotiated, package, or other special rates where applicable, coupons, and promotions) and the terms of the various promotions and discounts." D.E. [53-2], Fact 21. Plaintiff wrote several computer queries in an attempt to "mine the data for 'the lowest net rate.'" D.E. [53-2], Fact 21. It appears that Plaintiff has not successfully been able to come up with one number that constitutes the "lowest net rate"

25

for all tickets sold, nor has Plaintiff been able to come up with an exact estimate of its damages arising out of this purported breach of contract using those queries. Defendants contend that Plaintiff's inability to state the amount of damages it is seeking, and Plaintiff's inability to state the "lowest net rate," means that Plaintiff cannot survive summary judgment. However, Plaintiff contends that part of the problems in calculating the price comes from the way the data is structured. "For many tickets, [the] price seems to be zero, though usually, this zero price is not really zero because the tickets were purchased as part of a package of other tickets." D.E. [89], 19. It is apparent that Plaintiff is having difficulty calculating the exact full amount of damages based on the amount of and perhaps the formatting of Defendants' data, but Plaintiff states that despite these difficulties, summary judgment should not be granted because "[t]here is ample evidence in the case for the jury to make an accurate damage calculation once the Court issues proper charges." D.E. [89], 20.

In Georgia, the party claiming damages must furnish the jury with "sufficient data to estimate the damages with reasonable certainty. [But i]t is not necessary, however, that the party on whom the burden rests should submit exact figures." *Wheat Enters., Inc. v. Redi-Floors, Inc.*, 231 Ga. App. 853, 855 (1998). Although calculating damages in this case, presuming a breach of contract is found, might not be easy because it appears that Defendants offered many different rates, discounts, packages, etc., over the years, and there

26

is an abundance of data – there is also clearly evidence from which damages calculations can be made with reasonable certainty. Here, damages can be calculated by looking at the data produced by Defendants, which contains record of what different rates Defendants charged its customers over the period in question, and comparing that to what Plaintiff's were charged by Defendants. Although Plaintiff may not have come up with a successful query of all the data that results in "the lowest net rate"for all tickets sold, the court thinks that at least some of Plaintiff's damages are calculable to a reasonable degree of certainty. Even if all of the free tickets or package deals are excluded, Plaintiff still may be able to show that another particular reseller or third party received a lower rate and recover damages for that breach. For instance, Plaintiff contends that Defendants sold tickets to another ticket broker at 25% discount off of general admission, while Plaintiff was only receiving 20% off. The court thinks it could be easily determined what the difference is between what Plaintiff was charged and what that one particular vendor was charged, even if an overall "lowest net rate" cannot be calculated. Further, nominal damages may be awarded in a breach of contract action, even where "damages are not susceptible of reasonable certainty of proof as to their extent." *King v. Brock*, 282 Ga. 56, 57 (2007). This precludes granting summary judgment in Defendants' favor. Defendants' Motion for Summary Judgment is DENIED [53].

      **C.     Defendant's Motion for Summary Judgment Two**

AO 72A
(Rev.8/82)

In their Motion for Summary Judgment 2, Defendants seek summary judgment on Counts Two through Nine of Plaintiff's Amended Complaint. Those counts allege the following:

- Count Two: Breach of the Supplier Agreements for improper termination and suspension.

- Count Three: Breach of the Supplier Agreements for failure to indemnify Plaintiff for their use of Defendants' photography and information.

- Count Four: Breach of the implied duty of good faith found in the Supplier Agreements.

- Count Five: Breach of the Supplier Agreements for failure to allow Plaintiff to set its own rates.

- Count Six: "Damages for dishonor of post September 2008 admissions."

- Count Seven: Fraud.

- Count Eight: "Damages for Deceptive and Unfair Trade Practices.

- Count Nine: Interference with Prospective Economic Advantage.

Amended Complaint, 38-43. As there are many claims, all involving different facts, the court addresses each claim and the accompanying relevant facts and arguments separately.[13]

_____

[13] Based upon the court's previous ruling regarding the validity of the Supplier Agreements, Plaintiff's breach of contract claims arising out of those Supplier Agreements can only be based on the New Jersey Supplier Agreement, although the court addresses the Supplier Agreements as a whole.

### 1. Count Two: Breach of the Supplier Agreements for improper termination and suspension

The parties' dispute arises, in part, out of Defendants' contentions that Plaintiff's website was false and misleading, and further, that Plaintiff was purportedly charging rates to its customers that were higher than Medieval Times' general admission rate, resulting in customers who purchased vouchers from Alcatraz showing up to the show and finding out they had paid more than the posted general admission rate. Starting in early 2008, it appears that Medieval Times began expressing its discontent with Plaintiff's website and with the rates Plaintiff was charging.

After the Supplier Agreements were executed, the parties also executed what they refer to as the 2007 National Contract and the 2008 National Contract. There appears to be no dispute that the parties executed those agreements, although the parties disagree as to what legal effect the National Contracts have with regard to the Supplier Agreements. At any rate, the 2008 National Contract contained pricing terms, and on its face, expired on September 30, 2008. Additionally, each Supplier Agreement contained a termination clause that states the following

> 12. TERMINATION. Either party may terminate this Agreement with ninety (90) days advance written notice. The date 90 days following the termination is the "Termination Date." Supplier agrees to honor all reservations made by Buyer prior to the termination date.

E.g., Amended Compl., Ex. F. It is undisputed that "[o]n May 2, 2008, Medieval Times gave written notice of termination of the Supplier Agreements to Alcatraz. The 90-day notice period expired on July 31, 2008." D.E. [54-2], Fact 9. Even after expiration of that 90-day notice period on July 31, 2008, "Medieval Times continued to honor the pricing terms set forth in the 2008 National Contract and accepted Alcatraz reservations through the agreed-upon expiration of the 2008 National Contract: September 30, 2008." D.E. [54-2], Fact 10.

Plaintiff does not contend that this termination was wrongful. Instead, Plaintiff alleges that in early 2008, when Defendants began expressing their discontent with Plaintiff's website and rates, Defendants breached the aforementioned termination provision of the Supplier Agreements. Defendants contend that any actions it took prior to the May 2, 2008, termination did not constitute a breach of contract, and further, that Plaintiff can allege no damages because it is undisputed that "Medieval Times continued to honor the pricing terms set forth in the 2008 National Contract and accepted Alcatraz reservations through the agreed-upon expiration of the 2008 National Contract: September 30, 2008." D.E. [54-2], Fact 10.

Plaintiff appears to base its argument regarding improper termination solely on an April 12, 2008, letter sent to Plaintiff by Medieval Times's attorney at the time, Dan Chambers. D.E. [91], 3, 6. Plaintiff does not actually cite to any letter from Dan Chambers. Instead, Plaintiff cites to two letters from their own attorney to Dan Chambers. D.E. [92],

30

351-55. Those letters do indicate that Plaintiff received a letter requesting that it stop selling Medieval Times tickets immediately. *Id*. Further, although Plaintiff did not cite the letter of Dan Chambers, it is included in Plaintiff's 350+ page "appendix" of evidence. *Id*. at 373. The letter, dated April 12, 2008, purports to have been sent to Alcatraz, and it "demands" that "by the close of business on April 18, 2008," Medieval Times must "cease all of its sales of Medieval Times' tickets and issuance of vouchers to Medieval Times shows." *Id*. A jury could reasonably find that this letter constituted a termination or attempted termination of the Supplier Agreements. Further, as the Supplier Agreements require 90 days notice of termination, and there is evidence showing that Defendants, through their attorney, gave notice on April 12, 2008, demanding that Plaintiff cease all sales of Medieval Times tickets only six days later, there is evidence from which a reasonable jury could find that the Supplier Agreements were breached.

However, to recover for a breach of contract, Plaintiff must also show that it was damaged by the breach. *TechBios, Inc. v. Champagne*, 301 Ga. App. 592, 595 (2009) ("The elements for a breach of contract claim in Georgia are the breach, which must be more than *de minimis*, and the resultant damages to the party having the right to complain about the contract being broken."). Plaintiff admits that Defendants honored all vouchers until September 30, 2008. As such, Plaintiff contends that it was injured due to a "hiatus and disruption the sales process," which "not only . . . disrupted the orderly sales process, it also

31

caused Alcatraz to have to pay Brian Raley," an attorney, for his services. D.E. [91], 6-7.

For this proposition, Plaintiff cites no evidence showing that its sales were actually disrupted

or that it stopped selling tickets after Defendants' request. The only evidence Plaintiff cites

is a 2010 declaration of Janice Cullen, in which she states that "[t]o date, Alcatraz has paid

attorney fees and expenses related to the dispute with Medieval Times in the amount of

$407,969.58." D.E. [92], 90. The declaration does not specify which, if any, of those fees

resulted of the purported wrongful termination. Plaintiff also cites, without any specificity,

seven pages of what appears to be a summary of all litigation expenses incurred by Plaintiff

in this case. D.E. [92], 95-102. None of those expenses reference Bryan Raley, the attorney

who Plaintiff contends they were forced to hire due to the wrongful termination, and further,

none of the time entries have dates in early 2008. *See id*. The earliest date listed is August

28, 2008, months after Plaintiff alleges the wrongful termination occurred. *See id*. As such,

Plaintiff has offered no competent evidence that it was damaged by the allegedly wrongful

termination, and Defendants should be granted summary judgment on Count Two of

Plaintiff's Amended Complaint.

> **2.** **Count Three: Breach of contract for failure to indemnify Plaintiff for their use of Defendants' photography and information**

In Count Three of the Amended Complaint, Plaintiff claims that it is entitled to be fully indemnified for all costs, expenses, damages, and attorney fees it has incurred as a result of Defendants' breach of the following provision:[14]

> 14. GENERAL: . . . Supplier agrees that Buyer may use Supplier's photography and information for a purpose consistent with this Agreement to promote Supplier's Services, and Supplier will indemnify Buyer for any liability whatsoever (including attorney's fees) arising by reason of Buyer's use of the photography and information.

E.g., Amended Compl., Ex. F. Plaintiff contends that Defendants "caused the invocation of the indemnity provision" when Defendants sent Alcatraz the April 12, 2008 "cease and desist" letter, and when Defendants brought counterclaims against Plaintiff arising out of Plaintiff's use of Defendants' trademarks. D.E. [91], 12. Defendants further "triggered" the indemnity clause when it sued Plaintiff in California for trademark violations. *Id.* So essentially Plaintiff is requesting that Defendants indemnify Plaintiff for liabilities resulting from Defendants own suit against Plaintiff. Plaintiff admits that, "It is unusual for a party to indemnify against what a party itself does to damage another contract party, but that is the result here." *Id.* at 13. Plaintiff further acknowledges that it is only seeking attorney fees, litigation expenses, and costs arising out of this litigation. D.E. [54-2], Fact 9.

According to Defendants, to read Paragraph 14 in the manner insisted upon by Plaintiff, "defies a common-sense reading." D.E. [107], 4. Defendants contend that the

---

[14] The court is not sure that Plaintiff's claim is properly characterized as a breach of this following provision, or if Plaintiff is merely seeking indemnity based on this provision.

AO 72A
(Rev.8/82)

indemnity provision only applies to Alcatraz's "use [of the] photography and information for a purpose consistent with" the Supplier Agreements and to promote Defendants' services, and Defendants maintain that trademark violations and false advertising are clearly not consistent with the Supplier Agreement. Defendants further asserts that there is already a separate paragraph in the Supplier Agreement that covers attorney's fees, which precludes a reading of the Supplier Agreement that would require Defendants to indemnify Plaintiff against Defendants themselves. That portion of the Supplier Agreement states, "16. GOVERNING LAW: . . . [T]he prevailing party shall be entitled to receive from the non-prevailing party all costs, expenses, damages, and fees (including reasonable attorney's fees)." E.g., Amended Compl., Ex. F.

The court finds instructive *SRG Consulting, Inc. v. Eagle Hosp. Physicians, LLC*, 282 Ga. App. 842, 844 (2006). In *SRG Consulting*, SRG sued Eagle, and "Eagle counterclaimed, asserting that SRG is contractually obligated to indemnify Eagle . . ." against the claims made by SRG, based on a provision that read "SRG agrees to indemnify and hold harmless Eagle from any and all claims, judgments, suits, actions, cause of action losses, liabilities, costs or damages, whatsoever, including attorney's fees and expenses incurred or sustained, which relate to the services provided by SRG under this Agreement." *Id*. at 843-44. The language did not expressly preclude indemnification for suits brought by SRG itself. The Georgia Court of Appeals found that SRG was not required to indemnify

Eagle for the cost of defending against SRG's claims. *Id.* at 844. First, the court held that "the purpose of an indemnity clause in a contract is not to protect the parties to the contract from legal action by each other to enforce the contract." *Id.* at 845. Furthermore, the agreement between the parties "in a separate section entitled 'Attorney's Fees and Costs,' provides that, in the event of a breach by either party, 'the breaching party hereby agrees that it shall pay all reasonable attorney's fees and costs incurred by the non-breaching party in the enforcement of this Agreement.'" *Id.* The Georgia Court of Appeals noted that it "must avoid construing a contract in a way that renders a portion of the contract meaningless." *Id.*

Generally, when parties to a contract agree to indemnify the other from some sort of liability, the parties are agreeing to "indemnify and save harmless the indemnitee against liability of the indemnitee to **a third person**, or against loss resulting from such liability." *Thomasson v. Pineco, Inc.*, 173 Ga. App. 794, 795 (1985) (emphasis added). Contracts often contain indemnity clauses, and "the purpose of an indemnity clause in a contract is not to protect the parties to the contract from legal action by each other to enforce the contract." *SRG Consulting, Inc.*, 282 Ga. App. at 845. Nor, in the case here, should it be used to protect Plaintiff from Defendants' suit for wrongful use of Defendants' trademarks and proprietary information. Plaintiff's reading of the Supplier Agreement would essentially act as a waiver of Defendants' right to bring any suit against Plaintiff for misuse of the photos and information because it would require that even if Defendants won and received a damages

35

award and an award of attorneys' fees, Defendants would have to indemnify Plaintiff for that amount, essentially paying themselves. Furthermore, "[a] contract should be construed by examining the agreement in its entirety, and not merely by examining isolated clauses and provisions thereof." *Alimenta (USA) v. Oil Seed South, LLC*, 276 Ga. App. 62 (2005). In the present case, separate from the paragraph discussing indemnity surrounding the use of photographs and information, Plaintiff and Defendants agreed to a provision explicitly covering litigation costs that may be recovered by a prevailing party in a suit arising out of the Supplier Agreements. Plaintiff does not have a claim for indemnity against Defendants under Paragraph 14.

### 3. Count Four: Breach of the implied duty of good faith found in the Supplier Agreements

"It is a well-recognized principle of contract law 'that both parties are under an implied duty of good faith in carrying out the mutual promises of their contract.'" *S. Bus. Machs. of Savannah, Inc. v. Norwest Fin. Leasing, Inc.*, 194 Ga. App. 253, 256 (1990). "'Good faith' is a shorthand way of saying substantial compliance with the spirit, and not merely the letter, of a contract." *Fisher v. Toombs County Nursing Home*, 223 Ga. App. 842, 845-46 (1996). However, a claim for breach of the implied covenant of good faith and fair dealing is not an independent cause of action apart from a breach of contract claim. *Stuart Enters. Intern., Inc. v. Peykan, Inc.*, 252 Ga. App. 231, 234 (2001). To prove a breach of the implied duty of good faith and fair dealing, a plaintiff must set forth facts showing a breach

36

of an actual express term of an agreement. *Morrell v. Wellstar Health Sys., Inc.*, 280 Ga. App. 1, 5 (2006) ("[T]here is no independent cause of action for violation of the covenant apart from breach of an express term of the contract."). As such, Plaintiff must show that Defendants owed a contractual obligation to Plaintiff, and that Defendants breached that covenant and also breached the implied duty of good faith and fair dealing. *See Onbrand Media v. Codex Consulting, Inc.*, 301 Ga. App. 141, 147-48 (2009).

Defendants contend that they are owed summary judgment on Plaintiff's claim regarding breach of this implied covenant because Plaintiff has offered no evidence of bad faith. Plaintiff, however, asserts that "Medieval Times has breached the obligation of good faith on many occasions." D.E. [91], 15. Plaintiff alleges that the following constituted breaches of the obligation of good faith:

1.   Medieval Times lied to Alcatraz every time Medieval Times submitted a net rate sheet after the Supplier Agreements were signed when it did not give Alcatraz it lowest rate.

2.   Medieval Times violated the obligation of good faith when it refused to make the same promotions it was offering to its customers available to Alcatraz.

3.   Medieval Times violated the obligation of good faith when it, acting through Mario Barriero suckered Alcatraz into thinking it was all right to mark its tickets up above the gate rate and then complained.

4.   Medieval Times violated the obligation of good faith every time it talked to an Alcatraz customer about Alcatraz's pricing.

37

5.    Medieval Times violated the obligation of good faith every time it did not report customer complaints back to Alcatraz.

6.    Medieval Times violated the obligation of good faith every time it sued Alcatraz for Alcatraz's use of the Medieval Times trademark.

7.    Medieval Times violated the obligation of good faith when it went on its forum shopping spree to the U.S. District Court in California in direct violation of paragraphs 14 of the Supplier Agreements.

D.E. [91], 15. The court can eliminate many of these quickly.

First, the court notes that other than the seventh contention, Plaintiff has not actually mentioned which express portions of the Supplier Agreements Defendants' conduct breaches. Without the benefit of explanation by Plaintiff, the court has examined the Supplier Agreements, and as to the third, fifth, and sixth contention, the court can find no express provision in the Supplier Agreements that Defendants could have breached such that Plaintiff could maintain a claim for breach of the implied covenant of good faith and fair dealing. As to the fourth contention, Plaintiff cites no evidence in support of its contentions that Defendants spoke to any of Alcatraz's customers about Alcatraz's pricing.

Plaintiff's seventh contention is less clear. The court presumes Plaintiff is contending that Defendants, by suing in California for trademark violations, breached the provision in the Supplier Agreements stating that "Venue for any action shall be in Gwinnett County, Georgia . . . ." First, Plaintiff fails to explain how Plaintiff was damaged by such a claim,

AO 72A
(Rev.8/82)

as Plaintiff simply alleges that it is entitled to "the entire universe of damages proximately resulting from Medieval Times' breach of the Supplier Agreements." A breach of the implied duty of good faith and fair dealing is not an independent cause of action from a breach of contract, and therefore, damages must be shown. Plaintiff's burden is to put forth argument and evidence supporting its claim, and Plaintiff has not done so. Additionally, Plaintiff has not explained or presented evidence regarding how Defendants have done anything more than simply breach the contract, which is not enough to support a claim for breach of the implied covenant of good faith and fair dealing.

Both the first and second contentions quoted above arise out of Plaintiff's claim that Defendants breached the lowest net rate provision. The court finds that there is evidence that Defendants breached this provision, and further, there is sufficient evidence on the record from which a jury could conclude that Defendants acted in bad faith when they knowingly charged Plaintiff higher net rates than they were charging other resellers. However, this claim is duplicative of Plaintiff's claim in Count One of their contract, merely realleging the same breach, and therefore, even if Plaintiff were to show that Defendants breached their implied obligation of good faith and fair dealing, no remedy is authorized above and beyond what Plaintiff would be entitled to as a result of the breach of contract that Plaintiff is already alleging pursuant to Count One of the Amended Complaint. *See Serv. Master Co., L.P. v. Martin*, 252 Ga. App. 751, 756 (2001). "The only additional remedy authorized by

law . . . is an award of attorney fees and expenses of litigation as provided by OCGA § 13-6-11." *Id.*

> **4.** **Count Five: Breach of the Supplier Agreements for failure to allow Plaintiff to set its own rates**

In Count Five of Plaintiff's complaint, Plaintiff asserts that Defendants breached another portion of the Supplier Agreements. The language Plaintiff relies on is found in the same paragraph that deals with the Confidential Net Rate Schedules:

> 2. SERVICES AND NET RATES: Supplier agrees to provide Services to Buyer at the tax-inclusive net rates indicated on the Confidential Net Rate Schedule ("Rates"). The Rates are tax-inclusive and, and any difference between Buyer's selling price and the Supplier's Rates represents Buyer's service charge for selling the Services. **Buyer will set its own rates for the services that it provides to its customers.**

E.g., Amended Compl., Ex. F (emphasis added). Plaintiff contends that Defendants breached this provision in the contract when it sent the aforementioned April 12, 2008, letter requesting that Plaintiff immediately stop selling Medieval Times tickets.

Defendants contend that this language creates a right for Alcatraz but does not create a duty in Medieval Times, nor does it impose any obligation on Medieval Times or contain a promise by Medieval Times. Further, Defendants contend that Plaintiff admits that it set its own rates throughout the parties' relationship, and therefore, even if the language did create a duty, there was no breach. Finally, Defendants contend that there are no damages. Defendants point to the deposition testimony of Plaintiff's Rule 30(b)(6) designee who

40

stated that the only damages that resulted from the alleged breach arose when Medieval Times stopped doing business with Plaintiff in September 2008, after the 2008 National Contract expired. In other words, the 30(b)(6) deponent, Janice Cullen, stated that the breach Plaintiff was complaining of here was the fact that Defendants terminated the working relationship, and therefore, Plaintiff was no longer setting its own rates because the business relationship was over. However, Defendants point out that both parties had an express right to terminate the Supplier Agreements.

In response, Plaintiff contends that Defendants "breached the 'buyer will set its own rates' provision by insisting that Alcatraz reduce it [sic] rates to an amount equal to Medieval Times' General Admission rate. This demand . . . is a breach of the Supplier Agreements because it disrupted [Plaintiff's] sales and caused [Plaintiff's] staff a lot of grief and trouble." D.E. [91], 17. Further, the "damages included in this count are the entire universe of damages proximately resulting" from the breach of the Supplier Agreements. *Id*. Plaintiff does not address Defendants' argument that the language it relies upon creates no duty.

Under Georgia law, to recover under a theory of breach of contract, a plaintiff must show both a breach of contract and resultant damages. *TechBios, Inc.*, 301 Ga. App. at 595. The language Plaintiff relies upon merely says that Plaintiff will "set its own rates." If Defendants requested that Plaintiff lower its rates, Plaintiff could have simply declined.

AO 72A
(Rev.8/82)

Further, Plaintiff admits that it set its own rates for the entire duration of the parties'

relationship. D.E. [54-2], Fact 16. As such, Plaintiff admits that it received exactly the right

given to it by the Supplier Agreement. Plaintiff's claim for breach of contract found in

Count Five of its Amended Complaint fails.

     **5.**     **Count Six: "Damages for dishonor of post September 2008 admissions"**

It is undisputed that "Medieval Times . . . honor[ed] the pricing terms set forth in the

2008 National Contract and accepted Alcatraz reservations through the agreed-upon

expiration of the 2008 National Contract: September 30, 2008." D.E. [54-2], Fact 10.

Plaintiff contends, however, that after the Supplier Agreements were terminated and after

the 2008 National Contract expired, Defendants wrongfully dishonored certain ticket

vouchers. According to Plaintiff, it purchased valid ticket vouchers for admissions to the

castles from another reseller, Ticket Network, and then sold those vouchers to its customers.

Medieval Times did not honor those vouchers, and Alcatraz had to refund money to those

customers whose vouchers were dishonored. Ticket Network had no refund policy, and

therefore, Alcatraz was unable to recover from Ticket Network. Plaintiff claims, without

explanation, that the dishonors by Defendants were somehow a breach of contract

represented by the valid vouchers. Defendants assert that they were under no contractual

obligation to honor any vouchers sold by Alcatraz after September 30, 2008. Further,

Defendants contend that Plaintiff seems to be arguing that Defendants breached some sort

42

of contract with Plaintiff by failing to honor vouchers Plaintiff purchased from Ticket Network, yet Plaintiff has made no effort to describe the alleged contract. There is no indication as to who the parties are, what the substance of the contract is, etc. To the extent a contract exists, Defendants argue that the contract is between Ticket Network and Plaintiff – not Plaintiff and Defendants.

The court first takes issue with Plaintiff's citation to evidence. Plaintiff, in support of its contentions regarding the dishonored Ticket Network vouchers, cites generally to all 15 pages of the affidavit of Janice Cullen, forcing the court to try to determine which portions of the declaration support Plaintiff's statements. Cullen declares that "Alcatraz issued refunds to customers based [sic] because Medieval Times dishonored tickets in the amount of $5,211.75 as listed on Janice Cullen Declaration Exhibit 2 attached hereto." D.E. [92], 90. Exhibit 2, however, only indicates that only $2,762.80 worth of ticket amounts were refunded. *Id*. at 93. At any rate, Plaintiff clearly bases this claim on some sort of breach of contract by Defendants. A party claiming breach of contract has the burden of pleading and proving (1) the subject matter of the contract, (2) consideration, and (3) mutual assent by the parties to all of the contract terms. See O.C.G.A. § 13-3-1; *Broughton v. Johnson*, 247 Ga. App. 819 , 819 (2001). Plaintiff has made no attempt to show any of the above, and as such, the court cannot even determine whether a relevant contract existed between Plaintiff

43

and Defendants – much less, whether Defendants breached it. Defendants' request for summary judgment on this claim is granted.

## 6.   Count Seven: Fraud

Count Seven of Plaintiff's Amended Complaint asserts a cause of action for fraud. Plaintiff's claims for fraud arise solely out of Medieval Times' failure to provide the lowest net rate to Plaintiff. "The tort of fraud has five elements. These are: (1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff." *Artzner v. A & A Exterminators, Inc.*, 242 Ga. App. 766, 769 (2000). Defendants claim that there is no evidence of fraud. In response, Plaintiff maintains that misrepresentations were made in three ways:

> First, in the form of net rate sheets that reflected prices higher than those offered to other resellers. Second, by verbal misrepresentations made directly to Carolyn Ballard Bazzo and others by Mario Barriero and other Medieval Times personnel. Third, by the silence of Nate August and David Lindsey during conversations discussing prices occurred when they knew that lower prices were being offered and also knew the details of the low price terms of the Supplier Agreements and that Carolyn Ballard was relying on Medieval Times to give Alcatraz the lowest prices.

D.E. [91], 19. Plaintiff then goes on to assert, without any explanation, that there is evidence of each element of fraud. For that conclusory proposition and as to each element, Plaintiff cites "generally" the entire 39 page declaration of Ryan Windsor and the entire 46 page declaration of Carolyn Bazzo. For its claim that it has presented evidence of damages,

44

Plaintiff also cites the entire 60 page declaration of Janice Cullen. Plaintiff then concludes that "this evidence is sufficient to sustain an action of fraud." D.E. [91], 20. Plaintiff has left it entirely up to the court to determine what portions of its cited evidence support each element of its fraud.

The court first addresses the alleged failure to disclose by Nate August and David Lindsey. "An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts." *William Goldberg & Co. v. Cohen,* 219 Ga. App. 628, 631 (1995). "In the absence of a confidential relationship, no duty to disclose exists when parties are engaged in arm's-length business negotiations; in fact, an arm's-length relationship by its nature excludes a confidential relationship." *Infrasource, Inc. v. Hahn Yalena Corp.*, 272 Ga. App. 703, 705 (2005). "[T]he circumstances under which a confidential relationship can arise from an arm's-length negotiation between sophisticated businessmen are limited." *Id*. Plaintiff has made no argument that Plaintiff and Defendants had a confidential relationship, and the court thinks it is clear from the record that the parties did not have such a relationship. As such, there was no duty to disclose on behalf of any Defendants.

Further, Plaintiff has not explained how or in what manner it relied on the alleged misrepresentations, and even a review of the 80 some odd pages that Plaintiff cites in support of this element does not clear up the issue. Under Georgia law, "fraud inducing a

45

party to perform his legal obligations, such as the performance of a binding contract, is nonactionable as not causing damage." *Bridgers v. Investors Am., Inc.*, 154 Ga. App. 206, 208 (1980). Further, "[w]ith the element of justifiable reliance, 'it is not sufficient to show that false representations were knowingly made with an intent to deceive-there must also be proof that due care was exercised to discover the fraud.'"*Artzner*, 242 Ga. App. at 770. And "[i]n the case of a sophisticated businessman, 'greater diligence is required' to show justifiable reliance.'" *Infrasource, Inc.*, 272 Ga. App. at 707.

Plaintiff relies on the declarations of Ryan Windsor and Carolyn Bazzo, in their entirety, in support of its claims for fraud. The fraud Plaintiff alleges arises solely out of the purported misrepresentations made to Plaintiff that it was receiving as a low a rate as any third party, as promised in the Supplier Agreements. However, Ryan Windsor states that he was aware that children were getting in free if they bought tickets at any castle's box office, yet Plaintiff was not allowed to offer their customers free tickets for their children. D.E. [92], 12. It is clear then that Ryan Windsor knew that Plaintiff was not getting rates as low or lower than the prices given to any third party because Windsor knew that children were getting in free if they, or presumably their parents, purchased tickets from a castle directly. Windsor also indicates that he was suspicious about whether Plaintiff was receiving rates lower than other reseller's because other resellers were able to sell tickets at much lower prices than Plaintiff. D.E. [92], 14. Further, Carolyn Bazzo states that she "suspected from

talking to [a Medieval Times representative] that other people were getting a lower price than we were . . . ." D.E. [92], 51. Despite these suspicions, there is no evidence before the court that Plaintiff was even remotely diligent in trying to find out whether it was in fact getting lower rates than anyone else. As there is no evidence of justifiable reliance in this case, Plaintiff cannot recover for fraud.

### 7. Count Eight: Damages for deceptive and unfair trade practices

Count Eight of Plaintiff's Amended Complaint seeks damages for violations of Georgia's Uniform Deceptive Trade Practices Act. Defendants moved for summary judgment on this claim, correctly asserting that injunctive relief is the only relief available under the act. *See* O.C.G.A. § 10-1-373; *Moore-Davis Motors, Inc. v. Joyner*, 252 Ga. App. 617, 619 (2001 ). In response to Defendants' arguments, Plaintiff cites no evidence and fails to address the issue of injunctive relief. Nowhere in the Amended Complaint does Plaintiff seek injunctive relief, and in fact, the Amended Complaint shows that Plaintiff expressly seeks only damages related to its claim under the GUDTPA. In its brief, Plaintiff also does not claim that it is seeking injunctive relief. Therefore, Plaintiff's claims under Count Eight of its Amended Complaint fail as a matter of law.

### 8. Count Nine: Interference with prospective economic advantage

AO 72A
(Rev.8/82)

In Count Nine of its Amended Complaint, Plaintiff contends that Defendants tortiously interfered with Plaintiff's potential business relations. Plaintiff must show the following elements for a claim of tortious interference:

> (1) improper action or wrongful conduct by the defendant without privilege, (2) the defendant acted purposely and with malice with the intent to injure, (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff, and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Boeing Co. v. Blane Intern. Group*, 276 Ga. App. 672, 675 (2005). Defendants contend that there is no evidence that it interfered in any way with Alcatraz's contractual or business relationships. Further, Defendants argue that Medieval Times was not a stranger to the contracts, customer relationships, or business relationships that it allegedly interfered with, and therefore, Plaintiff cannot sustain a claim for tortious interference.

It appears that Plaintiff's claim involves situations where customers were dissatisfied when they discovered that Alcatraz's pricing was higher than Medieval Times' general admission rate. *See* D.E. [91], 23-24. Plaintiff claims that Medieval Times exacerbated the customer complaints and told customers that Alcatraz had overcharged and cheated them. First, the court notes that Plaintiff has cited no evidence showing that anyone at Medieval Times ever told anyone that purchased tickets from Alcatraz that Alcatraz had overcharged or cheated them. Although Plaintiff generally contends that "Medieval Times poisoned all future prospects that these dissatisfied customers would ever again buy any kind of ticket

48

from Alcatraz," Plaintiff also cites to no evidence showing that Medieval Times actually induced or caused any third party to discontinue their relationship with Plaintiff. Furthermore, "an entity that is a party 'to an interwoven contractual arrangement' is not a stranger to any of the contracts or business relationships that are part of the contractual arrangement and cannot be held 'liable for tortious interference with any of [those] contracts or business relationships.'" *ASC Const. Equip. USA, Inc. v. City Commercial Real Estate, Inc.*, 303 Ga. App. 309, 313 (2010). Here, the parties clearly had an interwoven contractual relationship, as Plaintiff was selling tickets to Medieval Times shows to customers, which Plaintiff got from Medieval Times through their contractual relationship. Medieval Times was not a stranger to the relationships with which Plaintiff contends Medieval Times interfered. Defendants' request for summary judgment on this claim is granted.

Defendants Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART [54].

### D.      Motion for Summary Judgment 3

Defendants' Amended and Restated Counterclaim alleges causes of action for violations of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, *et seq.*, and for false advertising under O.C.G.A. § 10-1-421(a), trademark infringement and

49

false advertising pursuant to the Lanham Act, common law unfair competition and unfair and deceptive trade practices under California state law, breach of contract, intentional interference with prospective business relations, and negligent interference with prospective business relations. In their Motion for Summary Judgment 3, however, Defendants seek partial summary judgment with respect to only three of their counterclaims – those relating to false advertising, including those arising under O.C.G.A. § 10-1-421(a), and the Lanham Act, and those for unfair and deceptive trade practices under the California Business and Profession Code. *See* Amended and Restated Counterclaim*,* Counts I, IV, and VI.

Most of Defendants' counterclaims concern a website started by Alcatraz called www.medievaltickets.com. In the Summer of 2007, Alcatraz approached Medieval Times with the concept of developing the aforementioned website, and "Alcatraz said it planned to sell tours of medieval castles and other similar sites in Europe on the www.medievaltickets.com website, and that it also planned to sell vouchers to Medieval Times Dinner and Tournament events as a secondary tie-in to Alcatraz's primary business of selling 'castle tours' in Europe." D.E. [57-2], Facts 1-2. However, after the launch of the website, it is undisputed that "the sale of vouchers to Medieval Times events was the primary purpose of Alcatraz's business on the website and that the sale of 'castle tours' represented an insignificant focus of the website." D.E. [57-2], Fact 4. Apparently, "Alcatraz sold not even one non-Medieval Times tour or attraction through its

50

www.medievaltickets.com website." D.E. [57-2], Fact 5. Defendants allegedly own certain trademarks related to the castles, including the mark "MEDIEVAL TIMES," (the "Mark"). On the website, Alcatraz displayed the Mark, photos of Medieval Times events, and detailed descriptions of the events. D.E. [57-2], Facts 8, 10. The website also used phrases such as "our castle," "our many full suits of armor," and "our hall of flags." *Id.* at Fact 8. Plaintiff purchased certain key words, including "Medieval Times" and misspellings of the word "medieval" combined with the word "time," from search engines, so that when the keywords were searched, "Alcatraz's link and advertisement for www.medievaltickets.com would appear as a 'sponsored link.'" D.E. [57-2], Fact 7.

Defendants allege that Plaintiff's use of Medieval Times' trademarks, proprietary photographs and information was deceiving such that it lured customers to its website so that customers purchased tickets from Alcatraz rather than Medieval Times. Defendants further contend that the manner in which Plaintiff used Defendants' trademarks, pictures, and information on www.medievaltickets.com was deceptive and misled customers into believing that they were dealing directly with Medieval Times and that they were on the official Medieval Times website. Defendants' claims for false advertising stem out of this deception, as Defendants contend that "Having misled the customer to believe they were dealing directly with Medieval Times, Alcatraz used intentionally misleading price advertisements to further deceive customers." D.E. [57-1], 7. The misleading price

51

advertisements "misled customers into believing that they were getting an internet discount off the general admission or retail rate, when in fact, even with the false discount, consumers were most often paying an artificially inflated price for a ticket they could have purchased directly from Medieval Times for less." *Id*. at 7-8. Alcatraz allegedly advertised "Our Adult Retail Rate" or "Our Adult Rate" and "Our Adult Internet Rate," and the internet rate was less than the retail rate, "giving the customer the false impression that the retail rate was the general admission or face value of the ticket they were purchasing . . . ." *Id*. at 8. According to Defendants, the "Our Adult Retail Rate" was often significantly marked up from the Medieval Times general admission or retail rate.

Defendants have moved for summary judgment on those claims as they relate to the alleged misleading pricing scheme, but not on the remainder of its claims, including those for trademark violations and those arising out of the allegations that the website is false and misleading. However, the court thinks that many of Defendants' claims, including ones that are not a subject of this summary judgment motion, are inextricably intertwined. A determination of whether the "Our Adult Retail Rate" and "Our Adult Internet Rate" are misleading in the fashion that Defendants contend, requires a determination or at least a discussion of whether Alcatraz's use of Defendants' Mark, information, and proprietary photos mislead consumers into believing that www.medievaltickets.com was the official Medieval Times website. As such, were the court to rule on Defendants' Motion for

52

Summary Judgment 3, it would result in the court, at least in part, unintentionally or unavoidably ruling on some of those other claims on which Defendants have not moved for summary judgment. As to those claims, the court does not have before it all material and undisputed facts and parties have not fully briefed the issues. Therefore, the court declines to address Defendants' motion on the merits, and Defendants' Motion for Summary Judgment is DENIED [57].

### E.    Motion for Leave

As stated previously, while this case was in the Superior Court of Gwinnett County, both Plaintiff and Defendants moved for leave to file amended pleadings. The state court granted those motions and deemed the proposed amended pleadings that the parties submitted with their motions to be filed as of February 9, 2010. In the state court's order granting leave to file the amended pleadings, the state court stated that "[t]he parties shall not be required to plead in response to the Amended Complaint or the Amended and Restated Counterclaim, although the parties may file responsive pleadings should they desire to do so." D.E. [1-64]. On the following day, February 10, 2010, Defendants removed the case to this court. Since that time neither party has filed any responsive pleading to the amended pleadings. The time to do so has passed. *See* Fed. R. Civ. P. 81(c)(2).[15]

_____

[15] Rule 81(c)(2) states that "A defendant who did not answer before removal must answer or present other defenses or objections under these rules within the longest of these period: (A) 21 days after receiving--through service or otherwise--a copy of the initial pleading stating the claim for relief; (B) 21 days after being served with the summons for

Plaintiff filed the present motion seeking to file a responsive pleading to Defendants' Amended and Restated Counterclaim, out of a fear that Plaintiff may be in default. Alternatively, Plaintiff seeks an order from the court that preserves Plaintiff's denials of all the averments in Defendants' Amended and Restated Counterclaim. Defendants, in response, note that they do not consider Plaintiff to be in default and that they read the state court's order in conjunction with Federal Rule of Civil Procedure 81. When read together, Defendants assert that the state court order relieved the parties of any obligation to respond to the amended pleadings in any fashion, but if either party chose to file a response, Rule 81 provided the applicable time limits. Defendants state that there is no need for Plaintiff to file an answer to Defendants' Amended and Restated Counterclaim, but if the court allows Plaintiff to do so, Defendants would like leave to file an answer to the Amended Complaint.

The court first notes that if Plaintiff was in default for failure to file a responsive pleading, so are Defendants. At this juncture in the proceedings, the court and the parties agree it makes little sense to find that any party defaulted, as both sides have clearly been involved in the litigation of this case. It also appears that neither party finds it necessary to file an answer to the others' amended pleadings unless it is required to preclude default. As such, the court finds that neither party is in default by virtue of failing to file a responsive pleading to either the Amended Complaint or the Amended and Restated Counterclaim.

an initial pleading on file at the time of service; or (C) 7 days after the notice of removal is filed."

Neither party should file a responsive pleading. To the extent it matters at this point in the litigation, the court deems all of the allegations and averments made in the Amended Complaint as denied by Defendants, and all of the averment and allegations made in the Amended and Restated Counterclaim as denied by Plaintiff. Plaintiff's Motion for Leave to File is GRANTED IN PART and DENIED IN PART [122].

## III.  Conclusion

Defendants' Motion for Summary Judgment is DENIED [53]. Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART [54]. Defendants' Motion for Summary Judgment is DENIED [57]. Plaintiff's Motion to Strike is DENIED AS MOOT [101]. Plaintiff's Motion to Strike is DENIED AS MOOT [103]. Plaintiff's Motion to Strike is DENIED [104]. Defendants' Motion for Oral Arguments is DENIED [109], as the court has all it needs before it to rule on the present motions. Plaintiff's Motion for Leave to File is GRANTED IN PART and DENIED IN PART [122]. The parties are DIRECTED to file a proposed consolidated pretrial order within thirty (30) days of the date of this Order.

**IT IS SO ORDERED** this 30th day of March, 2011.

 s/  J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

55